**IN THE DISTRICT COURT OF ADAIR COUNTY
STATE OF OKLAHOMA**

| | |
|---|---|
| STATE OF OKLAHOMA *ex rel.* Gentner Drummond, Attorney General of Oklahoma, | **FILED**<br>DISTRICT COURT<br>ADAIR COUNTY, OKLAHOMA<br>September 5, 2025 9:34 AM<br>NICHOLE COOPER, COURT CLERK<br>Case Number CJ-2025-65 |

STATE OF OKLAHOMA *ex rel.* Gentner
Drummond, Attorney General of Oklahoma,

*Plaintiff*,

v.

3M COMPANY, f/k/a Minnesota Mining and
Manufacturing Company;
CORTEVA, INC.;
DUPONT DE NEMOURS INC., f/k/a
DOWDUPONT, INC.;
E.I. DUPONT DE NEMOURS AND
COMPANY, individually and as successor in
interest to DuPont Chemical Solutions
Enterprise;
THE CHEMOURS COMPANY, individually
and as successor in interest to DuPont Chemical
Solutions Enterprise; and
THE CHEMOURS COMPANY FC, LLC,
individually and as successor in interest to
DuPont Chemical Solutions Enterprise

*Defendants.*

CASE NO:

CJ-2025-65

**FIRST AMENDED PETITION**

Plaintiff, the State of Oklahoma ("State" or "Oklahoma"), acting by and through its Attorney

General, Gentner Drummond, files this Petition against the below described Defendants, as follows:

**NATURE OF THE ACTION**

1.      Through this action, Oklahoma seeks damages, injunctive relief --- including

remediation and restoration ---  and other relief and remedies to address the deceptive, unfair

marketing of, as well as the environmental contamination and public health harm caused by,

1

**EXHIBIT
1**

Defendants' products, such as those promoted, sold, and/or distributed to consumers in Oklahoma under the trade names Scotchgard™ and Teflon™, which were designed, formulated and/or manufactured using toxic per- and polyfluoroalkyl substances ("PFAS") and which are *not* Aqueous Film-Forming Foam ("AFFF") firefighting products.

2.      This action concerns non-AFFF PFAS Products (hereinafter "Non-AFFF PFAS Products") which contained fluorochemicals and fluorosurfactants that Defendants manufactured, marketed, promoted, sold, and/or distributed, including perfluorooctane sulfonic acid ("PFOS") and perfluorooctanoic acid ("PFOA"), and are *not* connected with AFFF.

3.      Prior to the filing of this lawsuit, Oklahoma retained expert hydrogeologists who reviewed documents and data from the Oklahoma Department of Environmental Quality ("DEQ") and analyzed the State's hydrogeologic features, including at the specific locations at issue in this lawsuit, to assess the impact of Non-AFFF PFAS Products on Oklahoma's groundwater and/or other natural resources.

4.      Prior to the filing of this lawsuit, Oklahoma served Civil Investigative Demands ("CIDs") pursuant to the Oklahoma Consumer Protection Act, 15 O.S. §§ 751 et seq.

5.      These CIDs sought, *inter alia*, invoices from January 1, 1974, to the present from entities subject to Oklahoma's investigation for products other than AFFF which contained PFAS, including but not limited to products containing PFOA, APFO, PFOS, and/or PFBS, shipped to facilities within the State of Oklahoma.

6.      For the avoidance of doubt, the State, through this action, is *not* seeking damages, remediation, restoration, and/or other relief with respect to any contamination from PFAS that is related to the manufacture and use of AFFF, as damages and/or equitable relief from those

compounds are the subject of a lawsuit pending in MDL 2873 in the United States District Court for the District of South Carolina.

7.        On December 7, 2018, the Judicial Panel on Multidistrict Litigation ("JPML") entered an order creating MDL 2873.

8.        Notably, in its Order centralizing the AFFF docket, the JPML denied a motion by 3M Company to extend the scope of the MDL to encompass not just cases involving AFFF, but all cases relating to 3M's manufacture, management, disposal, and sale of PFAS. *See In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, 357 F. Supp. 3d 1391, 1396 (J.P.M.L. 2018).

9.        Since then, the JPML has refused to transfer cases that are not "obvious" AFFF actions. *See, e.g., In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, 2023 U.S. Dist. LEXIS 217910, \*6.

10.       As more fully detailed below, this lawsuit is *not* an AFFF action, let alone an "obvious" one.

11.       The State's expert hydrogeologists are of the opinion, to a reasonable degree of scientific probability, that it is most likely that the contamination and damage to Oklahoma natural resources originating from certain facilities with operations that have used, and/or are using, Non-AFFF PFAS Products, and where AFFF was not used, including the following facility known at this time: the Former Gulfstream Aerospace/Rockwell Automation site, located at 7400 NW 50th St., Bethany, OK 73008. (the "Former Gulfstream Site" or "Specific Location").

12.       The Former Gulfstream Site is located on a property identified by the Oklahoma County Assessor as Parcel Pin No. 2865-17-119-1000, and is currently owned by the Oklahoma City Airport Trust.

13.       The Former Gulfstream Site is *not* one of the properties comprising the Wiley Post Airport, a public-use airport situated on properties identified by the Oklahoma County

3

Assessor as Parcel Pin No. 2820-16-854-1426, No. 2817-16-854-1410, No. 2817-16-854-1400, No. 2818-16-854-1430, No. 2818-16-854-1440, No. 2819-16-854-1445, No. 2830-16-854-1720, and No. 2829-14-770-1000, all of which are located across Northwest 50th Street from the Former Gulfstream Site. The Wiley Post Airport is not a Part 139 certified airport, nor is it a current or former military installation being assessed by the Department of Defense for AFFF use or potential release.

14.        The contamination and damage to Oklahoma natural resources originating from the Former Gulfstream Site was and is due to PFAS contamination solely by Non-AFFF PFAS Products released, discharged, and/or disposed of from the Former Gulfstream Site, where upon information and belief, AFFF was neither used nor stored.

15.        Based upon a review of DEQ data and the hydrogeologic features of the area in the vicinity of Former Gulfstream Site, the State's expert hydrogeologists are of the opinion, to a reasonable degree of scientific probability, that the groundwater within a minimum of 4,000 feet west of the Former Gulfstream Site was and is contaminated with PFAS *solely* from Non-AFFF PFAS Products discharged from Former Gulfstream Site, where upon information and belief, AFFF was neither stored nor used.

16.        The map below depicts the approximate location of the Former Gulfstream Site and the approximate direction of groundwater flow at the site:

4



17.        The claims regarding Defendants' Non-AFFF Products at issue in this action, pertaining to contamination of the groundwater within a minimum of 4,000 feet west of the Former Gulfstream Site, do not arise out of or relate to the release, discharge, and/or disposal of AFFF at any location within Oklahoma, including but not limited to the properties comprising the Wiley Post Airport.

18.        Defendants' conduct at issue, pertaining solely to their design, manufacture, marketing, promotion, distribution, and/or sale of Non-AFFF Products and the resulting contamination of the groundwater within a minimum of 4,000 feet west of the Former Gulfstream Site, is not connected to any federal authority.

19.     Pursuant to 74 O.S. § 18b(A)(3), Attorney General Drummond, as the chief law officer of the State, is charged with initiating and prosecuting all actions in which the interests of the State or the people of the State are at issue.

20.     The State brings this action to hold Defendants accountable for the harms done to Oklahoma, its citizens, and its natural resources from Non-AFFF PFAS Products, including but not limited to, PFOS and PFOA originating from the Former Gulfstream Site, where upon information and belief, AFFF was neither stored nor used.

21.     As the State's investigation continues, additional locations where AFFF was neither stored nor used and from which PFAS, solely from Non-AFFF PFAS Products, has been released, discharged, and/or disposed may be the subject of additional litigation, as a part of this case and/or as a part of other cases, concerning harms done to Oklahoma, its citizens, and its natural resources from Non-AFFF PFAS Products, including but not limited to PFOS and PFOA.

## JURISDICTION AND VENUE

22.     This Honorable Court has personal jurisdiction over Defendants pursuant to 12 O.S. § 2004(F) because Defendants have sufficient contacts with the State of Oklahoma, both generally and with respect to the events, omissions, and harms giving rise to Plaintiff's claims, and exercising jurisdiction over them does not offend the traditional notions of fair play and substantial justice.

23.     Venue is appropriate in this judicial district pursuant to 12 O.S. §§137 and 143, as Defendants, as foreign corporations, transact business in this district.

## PARTIES

*PLAINTIFF*

24.          The State of Oklahoma, by and through Attorney General Gentner Drummond, brings this action on its own behalf and as *parens patriae* on behalf of the residents of Oklahoma. The State brings this action as an exercise of its authority to protect public trust resources and its police power, which includes, but is not limited to, its power to prevent pollution of the State's property and waters; to prevent and abate nuisances; and to prevent and abate hazards to public health, safety, welfare, and the environment.

*DEFENDANTS*

25.          The term "Defendant" or "Defendants" refers to all Defendants named herein jointly and severally.

26.          Any and all references to a Defendant or Defendants in this Petition include any predecessors, successors, parents, subsidiaries, affiliates and divisions of the named Defendants.

27.          When reference is made in this Petition to any act or omission of any of the Defendants, it shall be deemed that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation, or control of the affairs of Defendants, and did so while acting within the scope of their duties, employment or agency.

28.          **Defendant 3M Company (f/k/a/ Minnesota Mining and Manufacturing Company) ("3M")** is a Delaware Corporation and conducts business throughout the United States, with its principal place of business located at 3M Center, St. Paul, Minnesota 55144. 3M Company

7

has designed, manufactured, marketed, promoted, distributed, and/or sold products from the 1960s until 2002. 3M is registered to do business in Oklahoma. At all times relevant, 3M has purposefully availed itself of the privilege of conducting business in the State of Oklahoma, transacted business in the State of Oklahoma, contracted to distribute and supply its products in the State, and regularly caused its products to be sold in the State of Oklahoma. This action arises out of and/or relates to Defendant 3M's contacts with Oklahoma, including its having business transacted in Oklahoma, as well as tortious actions and/or omissions committed in whole or in part within Oklahoma, and specific personal jurisdiction is proper under one or more provisions of 12 O.S. § 2004, as well as the Due Process Clauses of the Fifth and Fourteenth Amendments to the Constitution of the United States of America.

29.    Defendant the **Chemours Co.** is a Delaware corporation with its principal place of business at 1007 Market Street, Wilmington, Delaware 19889. Chemours Co. was previously a subsidiary of Old DuPont and was spun out of Old DuPont into an independent, publicly traded company on July 1, 2015. Chemours Co. designed, manufactured, marketed, sold, and/or distributed products containing or breaking down into PFAS. At all times relevant, Chemours Co. has purposefully availed itself of the privilege of conducting business in the State of Oklahoma, has transacted business in the State of Oklahoma, contracted to distribute and supply its products in the State, regularly caused its products to be sold in the State of Oklahoma, and this action arises out of and/or relates to Defendant Chemours Co.'s contacts with Oklahoma, including its having business transacted in Oklahoma, as well as tortious actions and/or omissions committed in whole or in part within Oklahoma, and specific personal jurisdiction is proper under one or more provisions of 12 O.S. § 2004, as well as the Due Process Clauses of the Fifth and Fourteenth Amendments to the Constitution of the United States of America.

30.        Defendant the **Chemours Co. FC, LLC ("Chemours Co. FC")** is a Delaware LLC with its principal place of business in Wilmington, Delaware. Chemours Co. FC, LLC is a wholly-owned subsidiary of Chemours Co. Chemours Co. FC was previously a subsidiary of Old DuPont and was spun out of Old DuPont into an independent, publicly traded company on July 1, 2015. Chemours Co. FC is registered to do business in Oklahoma. Chemours Co. FC designed, manufactured, marketed, sold, and/or distributed products containing or breaking down into PFAS. At all times relevant, Chemours Co. FC has purposefully availed itself of the privilege of conducting business in the State of Oklahoma, has transacted business in the State of Oklahoma, contracted to distribute and supply its products in the State, regularly caused its products to be sold in the State of Oklahoma, and this action arises out of and/or relates to Defendant Chemours Co. FC's contacts with Oklahoma, including its having business transacted in Oklahoma, as well as tortious actions and/or omissions committed in whole or in part within Oklahoma, and specific personal jurisdiction is proper under one or more provisions of 12 O.S. § 2004, as well as the Due Process Clauses of the Fifth and Fourteenth Amendments to the Constitution of the United States of America.

31.        Defendants the **Chemours Co. and The Chemours Co. FC** are jointly referred to herein as "**Chemours**." Chemours designed, manufactured, marketed, sold, and/or distributed fluorosurfactants containing or breaking down into PFAS for use in Non-AFFF PFAS Products.

32.        Defendant **Corteva, Inc. ("Corteva")** is a Delaware corporation with its principal place of business at 974 Centre Rd., Wilmington, Delaware 19805. Corteva designed, manufactured, marketed, sold, and/or distributed products containing or breaking down into PFAS. At all times relevant, Corteva has purposefully availed itself of the privilege of conducting business

in the State of Oklahoma, has transacted business in the State of Oklahoma, contracted to distribute and supply its products in the State, regularly caused its products to be sold in the State of Oklahoma, and this action arises out of and/or relates to Defendant Corteva's contacts with Oklahoma, including its having business transacted in Oklahoma, as well as tortious actions and/or omissions committed in whole or in part within Oklahoma, and specific personal jurisdiction is proper under one or more provisions of 12 O.S. § 2004, as well as the Due Process Clauses of the Fifth and Fourteenth Amendments to the Constitution of the United States of America.

33.        Defendant **DuPont de Nemours, Inc. f/k/a DowDuPont, Inc. ("New DuPont")** is a Delaware corporation with its principal place of business at 974 Centre Road, Wilmington, Delaware 19805. New DuPont is registered to do business in Oklahoma.  New DuPont designed, manufactured, marketed, sold, and/or distributed products containing or breaking down into PFAS. At all times relevant, New DuPont has purposefully availed itself of the privilege of conducting business in the State of Oklahoma, has transacted business in the State of Oklahoma, contracted to distribute and supply its products in the State, regularly caused its products to be sold in the State of Oklahoma, and this action arises out of and/or relates to Defendant New DuPont's contacts with Oklahoma, including its having business transacted in Oklahoma, as well as tortious actions and/or omissions committed in whole or in part within Oklahoma, and specific personal jurisdiction is proper under one or more provisions of 12 O.S. § 2004, as well as the Due Process Clauses of the Fifth and Fourteenth Amendments to the Constitution of the United States of America.

34.        Defendant **E.I. du Pont de Nemours and Co. ("Old DuPont")** is a Delaware corporation with its headquarters and principal place of business at 974 Centre Road Wilmington, Delaware 19805. Old DuPont designed, manufactured, marketed, sold, and/or distributed products

containing or breaking down into PFAS. In 2015, Old DuPont created New DuPont to facilitate a merger with the Dow Chemical Company ("Old Dow"). New DuPont later spun-off two additional publicly traded companies: Corteva, which holds Old DuPont as a subsidiary, and Dow, Inc. which holds Old Dow as a subsidiary. At all times relevant, Old DuPont has purposefully availed itself of the privilege of conducting business in the State of Oklahoma, has transacted business in the State of Oklahoma, contracted to distribute and supply its products in the State, regularly caused its products to be sold in the State of Oklahoma, and this action arises out of and/or relates to Defendant Old DuPont's contacts with Oklahoma, including its having business transacted in Oklahoma, as well as tortious actions and/or omissions committed in whole or in part within Oklahoma, and specific personal jurisdiction is proper under one or more provisions of 12 O.S. § 2004, as well as the Due Process Clauses of the Fifth and Fourteenth Amendments to the Constitution of the United States of America.

35.        Chemours, Corteva, New DuPont, and Old DuPont are referred to collectively as **"DuPont," or "DuPont Defendants."** For decades, DuPont manufactured products containing PFAS, including PFOA, which DuPont obtained from 3M. In the early 2000s, after 3M had ceased the manufacture of PFOS and PFOA, DuPont itself began to manufacture PFOA. DuPont designed, manufactured, marketed, sold, and/or distributed fluorosurfactants containing or breaking down into PFAS for use in Non-AFFF PFAS Products.

## FACTUAL ALLEGATIONS

### Properties of PFAS

36.        PFAS are human-made chemicals used in manufactured products consisting of a chain of carbon and fluorine atoms.

11

37.    The carbon-fluorine bond is one of the strongest bonds in chemistry and imparts to PFAS their unique chemical properties.

38.    The carbon-fluorine bond in PFAS generally does not occur in nature.

39.    PFAS have strong surfactant properties, meaning they reduce the surface tension between a liquid and another liquid or solid, and are thus effective for products that require fire resistance, and oil, stain, grease, and water repellency.

40.    The two most widely known and studied PFAS are PFOS and PFOA.

41.    On December 1, 2023, the International Agency for Research on Cancer (IARC), the cancer agency of the World Health Organization (WHO), announced that, after thoroughly reviewing the extensive published literature, a Working Group of 30 international experts from 11 countries was convened by the IARC Monographs program for a meeting on 7–14 November 2023 in Lyon, France and classified PFOS as possibly carcinogenic to humans (Group 2B) and PFOA as carcinogenic to humans (Group 1).

42.    The chemical structure of PFOS and PFOA, and other PFAS, makes them mobile and extremely resistant to breakdown in the environment.

43.    Indeed, scientists are unable to even estimate an environmental half-life (i.e. the time it takes for 50% of the chemical to decay) for PFAS.

44.    PFAS are known as "forever chemicals" because they are immune to degradation, bio-accumulate in individual organisms and humans, and increase in concentration up the food chain.

**Defendants' History of Manufacturing and Selling Non-AFFF PFAS Products**

45.    Upon information and belief, the Defendants knew of the risks of PFAS to the environment and health.

46.         Indeed, Defendant 3M knew of the potential threats posed by PFAS by at least 1970.

47.         In the November 1970 issue of Fire Journal, the National Fire Protection Association (NFPA) published a letter by S.I. Kalkstein, the President of Chemical Concentrates Corporation titled "Toxicity of 'Light Water' to Fish," which advised that tests of 3M's AFFF product demonstrated that it was so "highly deleterious to marine life . . . [that] the entire test program had to be abandoned to avoid severe local stream pollution." Letters to the Association, Fire Journal, Nov. 1970, at 87.

48.         Indeed, a 1970 3M study revealed a lethal dose of PFAS in fish at 1 ppm, the lowest concentration tested. At this concentration, the fish were unable to swim upright and died within weeks of being exposed to PFAS. The fish that received a dose of PFAS at 4 ppm died within days; at 12.5 ppm the fish died within hours; and at 125 ppm the fish died within minutes.

49.         In response to Kalkstein's letter, 3M downplayed any significant adverse effect of its products, including PFOS. Hugh G. Bryce, the Technical Director of 3M's Chemical Division, wrote that 3M conducted tests to evaluate the safety of its AFFF products containing PFOS and that "tak[ing] into account the remote possibility that significant quantities of the fire-extinguishing agent would enter a body of water, as well as the fact that relatively high levels can be tolerated, it appears from a practical point of view that the use of 'Light Water' brand agents could not have any significant adverse effect on fish or other marine life in either fresh or salt water." Id.

50.         In 1975, 3M, the sole manufacturer of PFOS, learned that PFOS was present in the blood of the general population.

51.        In 1976, 3M confirmed that PFAS was bioaccumulating in the blood of its employees.

52.        In 1978, 3M conducted a study of PFAS toxicity in Rhesus monkeys in which every monkey involved in the study died.

53.        3M repeated the Rhesus monkey experiment at a low dose of 4.5 ppm of PFAS, and still, every monkey involved in the study died.

54.        In response to pressure from the United States Environmental Protection Agency ("EPA"), 3M announced a phase-out of its PFOS chemistry in 2000.

55.        Upon information and belief, Defendant 3M continued to produce PFOS until 2002 and continues to produce PFAS to the present.

56.        After 3M's phase-out of PFOS, the remaining Defendants continued to manufacture and sell PFAS-containing products. Indeed, DuPont saw an opportunity to grab a share of 3M's market when 3M exited, although DuPont similarly had decades of evidence that PFAS were highly toxic and dangerous to the environment and human health.

57.        Upon information and belief, DuPont also knew about the toxicity of PFOA as early as the 1960s and was aware that PFAS were capable of contaminating the environment.

58.        By the early 1960s, DuPont researchers concluded that PFOA was toxic and caused adverse liver reactions in dogs and rats.

59.        As early as 1966, DuPont was aware that PFOA could leach into groundwater.

60.        By 1979, DuPont had data indicating that its workers who were exposed to PFOA had a higher frequency of adverse health effects compared to unexposed workers.

14

61.     By the early 1980s, DuPont was aware of eye-related birth defects in the unborn rats exposed to PFOA in utero. DuPont removed all female workers from areas where they may come into contact with PFOA and began secretly monitoring female workers who had already been exposed to PFOA.

62.     By the mid-1980s, DuPont was aware that PFOA is biopersistent and bioaccumulative.

63.     Defendants had a duty to notify the EPA when they had information that reasonably supported the conclusion that a substance or mixture presented a substantial risk of injury to health or the environment. *See* Toxic Substances Control Act ("TSCA") § 8(e), 15 U.S.C. § 2607(e). Defendants breached this duty when they failed to provide the EPA with information about the risk to human health and the environment associated with PFAS.

64.     At all times relevant to this Petition, no containment measures were listed in Defendants' Safety Data Sheets ("SDS" (f/k/a/ Material Safety Data Sheets ("MSDS")), nor were the dangers to health or the environment inherent in Non-AFFF PFAS Products disclosed in the instructions, warning labels, and product packaging for such products.

65.     At all times relevant to this Petition, the MSDS and SDS instructions, warning labels and product packaging did not fully describe or adequately warn users of all of the health and environmental risks of Non-AFFF PFAS Products, which Defendants knew or should have known existed, or of all of the precautions they should have taken, which Defendants knew or should have known existed and were necessary.

**Fraudulent Transfers Between the DuPont Defendants**

66.     Upon information and belief, by 2013 Old DuPont began to consider restructuring the company to, in part, avoid liabilities related to PFAS contamination throughout the

country resulting from Old DuPont's manufacture, use, and discharge of PFOA into the environment.

67.      In approximately February 2014, Old DuPont formed Chemours Company as a wholly-owned subsidiary, with its board of directors controlled by Old DuPont.

68.      On June 26, 2015, Old DuPont and Chemours entered into the Separation Agreement ("Separation Agreement") to effectuate the "spin-off" of Chemours Company as a separate publicly traded company.

69.      Pursuant to the Separation Agreement, Old DuPont transferred its Performance Chemicals Business to Chemours Company in July 2015. Around the same time, Chemours FC was formed as a subsidiary of Chemours Company.  The transfer of the Performance Chemicals Business included Old DuPont's titanium technologies, fluoroproducts, and chemical solutions, and fluorochemical products and the business segment that manufactured, used, and discharged PFOA into the environment.  The transfer appears to have been made to Chemours Company and Chemours FC (collectively referred to as "Chemours").

70.      Chemours also assumed various liabilities for Old DuPont's prior use, manufacture, and discharge of PFAS, although the specific details regarding the liabilities that Chemours took on are not publicly available.

71.      The transfer included significant debts and failing product lines, with Old DuPont burdening Chemours with its massive historic and future environmental liabilities.

72.      Chemours did not receive a reasonably equivalent value in exchange for this transfer or obligation, and the assets transferred to Chemours were unreasonably small in relation to the business or transaction.

73.     Old DuPont knew or reasonably should have known that Chemours would incur debts beyond its ability to pay them when they became due.

74.     On July 1, 2015, Chemours transferred approximately $3.4 billion as a cash dividend to Old DuPont, along with a distribution in kind of promissory notes with an aggregate principal amount of $507 million.

75.     Chemours funded the $3.9 billion it distributed to Old DuPont by entering into approximately $3.995 billion of financing transactions and distributing approximately $3 billion in common stock to Old DuPont stakeholders on July 1, 2015, thereby rendering most of Chemours' valuable assets at the time unavailable to creditors.

76.     At the time of the Old DuPont-Chemours transfer, the Old DuPont Performance Chemicals Business held an estimated debt of approximately $4 billion and Old DuPont announced that it planned to phase out its manufacture and use of PFOA by 2015.

77.     Per the Separation Agreement, Chemours agreed to indemnify Old DuPont against and assume all of Old DuPont's liabilities from its Performance Chemicals Business, without any time limitation. This indemnification remains uncapped.  Chemours also agreed to indemnify Old DuPont against and assume for itself the performance chemical liabilities without regard to the nature of the liabilities, when they were incurred or arose, or which entity is named as the responsible party. Chemours further agreed to indemnify DuPont from, and assume all, environmental liabilities that arose prior to the spinoff if they were "primarily associated" with the performance chemicals business, which would be based on a determination made by Old DuPont that the liability was 50.1% attributable to Old DuPont's Performance Chemicals Business.

78.     Chemours also agreed to substitute itself for Old DuPont with respect to any order, decree, judgment, agreement, or action relating to the environmental liabilities it assumed.

17

79.     At the time of the Old DuPont-Chemours transfer, Old DuPont was fully aware of its potential liabilities related to PFAS contamination throughout the United States.

80.     After Chemours "spun-off," new members were appointed to Chemours' board of directors, however, the spin-off and related decisions were conducted while Old DuPont maintained control of the board. The new Chemours board did not take part in the Separation.

81.     At the time of the Chemours spin-off, Old DuPont had been sued, had been on notice of impending suits, and/or actually knew of likely litigation and its liability for damages and injuries from the manufacture of PFAS and PFAS-containing products.

82.     The intent and effect of creating Chemours was to allocate a significant portion of Old DuPont's environmental liabilities, including liabilities related to its PFAS chemicals and products. Old DuPont and Chemours effectuated this spin-off with the knowledge that Chemours would be insolvent and would not be able to bear the liabilities that Old DuPont transferred to Chemours, with the actual intent to deceive. This fraudulent transfer has likely limited the availability of funds to cover Old DuPont's liability, including for the claims that arise out of this case, which has harmed and will further harm the State.

83.     Old DuPont's knowledge and assessment of its liabilities—including environmental and other performance chemicals liabilities—have been comprehensive since it began its performance chemical operations, and its litigation-related liabilities have been increasing since at least the early 2000's.

84.     For example, in 2005, Old DuPont agreed to pay $16.5 million to resolve claims brought by the EPA for violations of the Toxic Substances Control Act and the Resource Conservation and Recovery Act related to its PFAS compounds.  This was the largest PFAS-related penalty in history at the time.

18

85.       Also in 2005, Old DuPont incurred hundreds of millions of dollars of liability related to litigation against it for the health risks of its PFOA use and disposal in Ohio and West Virginia, which had caused thousands of people to suffer serious medical diagnoses, including cancer, that were attributable to Old DuPont's fluorochemical products.

86.       Almost immediately after the Chemours spin-off, in December 2015, Old DuPont entered into an "Agreement and Plan of Merger" to form a new holding company called Dow DuPont, Inc., making Old DuPont and Old Dow subsidiaries of Dow DuPont, Inc.

87.       The formation of Dow DuPont, Inc. was the next step in Old DuPont's strategy to distance itself from its PFAS liabilities, which Old DuPont knew Chemours was unable to satisfy.

88.       Dow DuPont, Inc. later spun-off two additional publicly traded companies: Corteva, which holds Old DuPont as a subsidiary, and Dow, Inc. which holds Old Dow as a subsidiary.

89.       Dow DuPont, Inc. was then renamed New DuPont, which along with Dow, Inc., holds the vast majority of the tangible assets previously owned by Old DuPont.

### PFAS From Non-AFFF PFAS Products Has Impacted Oklahoma Citizens

90.       Oklahoma citizens have been exposed to the biocumulative and biopersistent Non-AFFF PFAS products for decades.

91.       These "forever chemicals" are carcinogenic and hazardous to the health of Oklahoma citizens and Defendants have been aware of their potential hazards for decades.

### Oklahoma's Natural Resources

19

92.     The State holds its waters in trust for the State's citizens and has an obligation to protect public interests in these waters through, among other things, maintaining the environmental quality of its waters.

93.     The State's natural resources include its waters, such as springs, streams, and groundwater within its boundaries or otherwise subject to its jurisdiction.

### PFAS From Non-AFFF PFAS Products Has Impacted Oklahoma's Natural Resources

94.     PFAS contamination from Non-AFFF PFAS Products has injured and continues to injure certain of the State's waters.

95.     As its investigation continues, the State expects that further PFAS contamination from Non-AFFF PFAS Products may be identified.

96.     PFAS from Non-AFFF PFAS Products have significantly affected the State's natural resources near certain facilities with operations involving the use of Non-AFFF PFAS Products, where AFFF was not used, including the following facility known at this time: Former Gulfstream Aerospace/Rockwell Automation, Bethany, OK ("Specific Location").

97.     Based upon a review of DEQ data and the hydrogeologic features of the area in the vicinity of Former Gulfstream Aerospace/Rockwell Automation, Bethany, OK, the State's expert hydrogeologists are of the opinion, to a reasonable degree of scientific probability, that it is most probable that the groundwater within a minimum of 4,000 feet west of the Former Gulfstream Aerospace/Rockwell Automation, Bethany, OK was and is contaminated with PFAS solely by Non-AFFF PFAS Products discharged from Former Gulfstream Aerospace/Rockwell Automation, Bethany, OK. This facility did not use AFFF.

98.     The relief Oklahoma seeks in this Petition pertains solely to damages relating to Defendants' Non-AFFF PFAS Products, including but not limited to, damages resulting from the

release of Defendants' Non-AFFF PFAS Products that contaminated the groundwater and/or other natural resources at and from the Specific Location identified above.

## CLAIMS FOR RELIEF

## COUNT I: VIOLATION OF OKLAHOMA CONSUMER PROTECTION ACT, 15 O.S. § 751 *et seq.*, (2024) (All Defendants)

99.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Petition as if restated in full therein.

100.    Plaintiff brings this Count under the Oklahoma Consumer Protection Act, 15 O.S. § 751, *et seq.* (2024) (the "OCPA").

101.    Plaintiff asserts this Count in the name of the State of Oklahoma in the public interest pursuant to the authority granted by 15 O.S. § 756.1, upon the grounds that Defendants have engaged in unfair and deceptive practices as defined in 15 O.S. § 752, and declared unlawful by 15 O.S. § 753.

102.    At all times relevant, Defendant 3M was engaged in trade and commerce within the State of Oklahoma, including the design, manufacture, marketing, distribution, and sale of Non-AFFF PFAS Products containing PFOS, PFOA, and/or their precursors, to Oklahoma consumers.

103.    At all times relevant, Defendant Corteva was engaged in trade and commerce within the State of Oklahoma, including the design, manufacture, marketing, distribution, and sale of Non-AFFF PFAS Products containing PFOS, PFOA, and/or their precursors, to Oklahoma consumers.

104.    At all times relevant, Defendant New DuPont was engaged in trade and commerce within the State of Oklahoma, including the design, manufacture, marketing, distribution, and sale

of Non-AFFF PFAS Products containing PFOS, PFOA, and/or their precursors, to Oklahoma consumers.

105.    At all times relevant, Defendant Old DuPont was engaged in trade and commerce within the State of Oklahoma, including the design, manufacture, marketing, distribution, and sale of Non-AFFF PFAS Products containing PFOS, PFOA, and/or their precursors, to Oklahoma consumers.

106.    At all times relevant, Defendant Chemours Co. was engaged in trade and commerce within the State of Oklahoma, including the design, manufacture, marketing, distribution, and sale of Non-AFFF PFAS Products containing PFOS, PFOA, and/or their precursors, to Oklahoma consumers.

107.    At all times relevant, Defendant Chemours Co. FC was engaged in trade and commerce within the State of Oklahoma, including the design, manufacture, marketing, distribution, and sale of Non-AFFF PFAS Products containing PFOS, PFOA, and/or their precursors, to Oklahoma consumers.

108.    Each of the Defendants, individually and acting through its respective employees and agents, as well as in concert with one another, knowingly, maliciously, recklessly and/or negligently failed and/or refused to advise Oklahoma consumers of the dangers and/or health risks posed by each of the Defendants' Non-AFFF PFAS Products containing PFOS, PFOA, and/or their precursors.

109.    Defendants' actions, inactions, and false and/or misleading representations alleged herein regarding their respective Non-AFFF PFAS Products were undertaken and/or made in connection with consumer transactions within the meaning of 15 O.S. § 752.

110.     Defendants' actions, inactions, and false and/or misleading representations were likely to, and did in fact, mislead Oklahoma consumers into purchasing Defendants' Non-AFFF PFAS Products, and caused substantial harm to consumers within Oklahoma.

111.     Defendants' actions, inactions, and false and/or misleading representations of the dangers and/or health risks posed by each of the Defendants' Non-AFFF PFAS Products constitute unfair or deceptive trade practices, within the meaning of 15 O.S. § 752, and were committed in violation of 15 O.S. § 753. Specifically, via the actions, inactions, and false and/or misleading representations alleged herein, each Defendant has:

   a. Engaged in false, misleading, and/or deceptive acts and practices of the dangers and/or health risks posed by each of the Defendants' Non-AFFF PFAS Products.in the conduct of trade or commerce regarding consumer transactions, in violation of 15 O.S. § 751, *et seq.*;

   b. Knowingly or with reason to know, made false and/or misleading representations as to the source, sponsorship, approval, and/or certification of their goods and services which were the subject of consumer transactions within Oklahoma, in violation of 15 O.S. § 753(2);

   c. Knowingly or with reason to know, made false representations as to the characteristics, ingredients, uses, and/or benefits of their goods and services which were the subject of consumer transactions within Oklahoma, in violation of 15 O.S. § 753(5);

   d. Knowingly or with reason to know, made false representations as to particular standards, styles, and models of their goods and services which were the subject of consumer transactions within Oklahoma, in violation of 15 O.S. § 753(8);

   e. Through their false and/or misleading representations, engaged in unfair or deceptive trade practices, in violation of 15 O.S. § 753(21); and

   f. In such other particulars as the evidence may show at trial.

112.     Specifically, with respect to 3M:

   a. Despite knowing that the PFAS contained in its products, such as PFOS, are toxic and adversely affect the environment and human health, 3M advertised brands, such as Scotchgard™, as consumer-friendly and safe for families and failed to disclose information regarding potential health and environmental issues to consumers to make educated purchasing decisions.

23

b.  In the late 1970s, 3M learned from scientists outside the company, Dr. Guy and Dr. Taves, that an unidentified organic fluorochemical had been found in "humans living in five cities" and concluded that "there is widespread contamination of human tissues with trace amounts of organic fluorocompounds derived from commercial products." 3M did more than simply stay silent despite the company's knowledge that the mystery compound was PFOS. In 1981, 3M scientist Jon Belisle, one of the authors of the 1976 internal company report confirming that the unidentified chemical was in fact PFOS, published an article in a scientific journal stating that the mystery compound was not man made but was a naturally occurring substance. As the Honorable Richard Mark Gergel found, "[a] reasonable inference from 3M's conduct surrounding the Guy and Taves' study is that the company knowingly withheld highly significant information that PFOS was now in the blood of the general population and actively sought to discredit an independent scientific work that could have disclosed this." Order and Opinion Denying Defendants' Motion for Summary Judgment on the Government Contractor Immunity Defense, Case No. 2:18-mn-2873-RMG, Dkt. No. 2601 at 16.

c.  3M conducted from the 1970s forward over a thousand studies related to the potential properties and effects of PFOS and related products on human health and the environment which should have been disclosed to the EPA under Section 8(e) the Toxic Substances Control Act, 15 U.S.C. § 2607(e). Prior to 1998, 3M released to the EPA 84 of those studies. In 1998, 3M began making long overdue disclosures to the EPA of over 1,200 additional studies. The EPA subsequently fined 3M $1.5 million dollars for its violations of federal disclosure laws, noting that the undisclosed reports "produced valuable, previously unreported information that will help the scientific community to better understand the presence of toxic substances in the environment." *Id.* at 16-17.

d.  Virtually all the early studies of the potential risks of PFOS had been conducted by 3M, and when the company revealed in 1998 that PFOS was in the blood of the general population, it maintained that it did not "believe that any reasonable basis exists to conclude that PFOS 'presents a substantial risk of injury to health or the environment.'" While 3M assured the public that its PFOS was not a threat to human health or the environment, Dr. John Butenhoff, 3M's Manager of Corporate Toxicology, reported internally that 3M needed to replace "PFOS-based chemistry as these compounds [are] **VERY** persistent and thus insidiously toxic." *Id.* at 17.

e.  3M continued engaging in deceptive practices in 2022, coinciding with its announcement that it would phase out all of its PFAS products by 2025. 3M represented that "PFAS can be safely made and used," and that its "products are safe for their intended uses." Not only did 3M make statements it knew to be false, but it omitted material information relating to the health hazards of its products.

    f.   As of the filing of this Petition, 3M has not stopped its deceptive advertisements, and continues promoting that its "products, including those containing PFAS, are safe and effective for their intended uses in everyday life." PFAS & Their Uses, pfas.3m.com, last updated January 28, 2025.

113.    Specifically, with respect to the DuPont Defendants:

    a.   As early as the 1960s, Old DuPont was aware that PFOA is toxic to animals and humans and that it bioaccumulates and persists in the environment. Old DuPont also knew that Teflon, and associated industrial facilities, emitted and discharged large quantities of PFOA and other PFAS into the environment and that many people had been exposed to its PFAS, including via public and private drinking water supplies. Yet, it continued to develop and market products for consumers as safe without revealing this knowledge that would have been material information to consumers' purchasing decisions.

    b.   By 1979, Old DuPont had data indicating that, not only was organic fluorine/PFOA building up in the blood of its exposed workers (and was, thus, "biopersistent"), but those workers exposed to PFOA had a significantly higher incidence of health issues than did unexposed workers. Old DuPont did not share this data or the results of its worker health analysis with the general public or government entities, including the State of Oklahoma, at that time.

    c.   The following year, Old DuPont internally confirmed, but did not make public, that PFOA "is toxic," that humans accumulate PFOA in their tissues, and that "continued exposure is not tolerable."

    d.   In 2004, EPA filed an administrative enforcement action against Old DuPont based on its failure to disclose toxicity and exposure information for PFOA in violation of the federal Toxic Substances Control Act ("TSCA") and Resource Conservation and Recovery Act ("RCRA"). Old DuPont eventually settled the lawsuit by agreeing to pay over $16 million in civil administrative penalties and conduct supplemental environmental projects. EPA called the settlement the "largest civil administrative penalty EPA has ever obtained under any federal environmental statute."

    e.   In February 2006, the NEW YORK TIMES noted that DuPont ran full page advertisements in its newspaper and other newspapers continuing to state that Teflon® is safe, including claims that Teflon® has been "safely used for 40 years" and continuing to omit that PFOA exposure was known to Old DuPont to cause harm to humans.

114.    Plaintiff seeks relief under the OCPA, 15 O.S. 751, *et seq.*, including, without limitation:

a. Injunctive and other equitable relief pursuant to 15 O.S. § 756.1;

b. Disgorgement and restitution pursuant to 15 O.S. § 756.1;

c. Costs, attorneys' fees, and investigative fees pursuant to 15 O.S. § 761.1; and

d. Other remedies as the Court may deem appropriate under the facts and circumstances of the case.

## COUNT II: STRICT PRODUCTS LIABILITY – DEFECTIVE DESIGN (All Defendants)

115.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Petition as if restated in full therein.

116.    At all times relevant to the Petition, each of the Defendants was regularly engaged in the design, formulation, production, creation, making, construction, assembly, rebuilding, sale, distribution, preparation, and labeling of Non-AFFF PFAS Products.

117.    At all times pertinent to this Petition, each of the Defendants regularly participated in placing their respective Non-AFFF PFAS Products into the stream of commerce with actual and/or constructive knowledge that these products would be distributed to, and/or used within the State of Oklahoma.

118.    As manufacturers, designers, refiners, formulators, distributors, suppliers, sellers, and/or marketers of Non-AFFF PFAS Products, each of the Defendants had a duty to make and sell products that were, and are, reasonably fit, suitable, and safe for their intended or reasonably foreseeable uses. *See Kirkland v. General Motors Corp.*, 1974 OK 52. Each of the Defendants owed that duty both to reasonably foreseeable users of their respective products, and also to any person or property that might reasonably be expected to come into contact with those products.

119.    Each of the Defendants owed a duty to all persons whom their respective products might foreseeably harm, including Plaintiff, not to manufacture, sell, and/or market any product that

is unreasonably dangerous for its intended and foreseeable uses, including Non-AFFF PFAS Products. *See Lamke v. Futorian Corp.*, 1985 OK 47.

120.     Each of the Defendants' Non-AFFF PFAS Products containing PFOS, PFOA, and/or their precursors was used in a reasonably foreseeable manner and without substantial change in the condition of each such product. These products were defective and unfit for their reasonable uses at the time they left each Defendant's respective possession or control. Each of the Defendants' Non-AFFF PFAS Products foreseeably contaminated the groundwater and/or other natural resources at and from the Specific Location.

121.     Each of the Defendants knew, or reasonably should have known, that its respective manufacture, marketing, and/or sale, as well as its respective customers' transport, storage, use, handling, release, spilling, and/or disposal of Non-AFFF PFAS Products in an intended or reasonably foreseeable manner would result in the release of PFOS and PFOA into the environment, including the groundwater and/or other    natural resources at and from the Specific Location.

122.     Each of the Defendants' Non-AFFF PFAS Products was defective in design and unreasonably dangerous because, among other things:

  a.  Each of the Defendants' Non-AFFF PFAS Products cause extensive and persistent PFOS and PFOA contamination when used in a reasonably foreseeable and intended manner;

  b.  PFOS and PFOA released into the environment from each of the Defendants' Non-AFFF PFAS Products has caused contamination at and from the groundwater and/or other natural resources at and from the Specific Location; and

  c.  Each of the Defendants failed to disclose reasonable, appropriate, or adequate scientific studies to evaluate the environmental fate and transport and potential ecological and human health effects of PFOS and PFOA.

123.     At all times relevant to this action, the Non-AFFF PFAS Products that each of the Defendants designed, manufactured, marketed, and sold were dangerous to the groundwater and/or

27

other natural resources at and from the Specific Location to an extent beyond that which would be contemplated by the ordinary consumer.

124.    At all times relevant to this action, the foreseeable risks to the groundwater and/or other natural resources at and from the Specific Location posed by each of the Defendants' Non-AFFF PFAS Products containing PFOS, PFOA, and/or their precursors outweighed the cost to each of the Defendants of reducing or eliminating such risks in their respective products.

125.    As a direct and proximate result of the defects in each of the Defendants' design, manufacture, marketing, and sale of Non-AFFF PFAS Products containing PFOS, PFOA, and/or their precursors, the groundwater and/or other natural resources at and from the Specific Location have become contaminated with PFOS and/or PFOA, causing the State and its citizens injury and damage.

126.    As a direct and proximate result of each of the Defendants' respective acts and omissions, as alleged herein, the State has incurred, is incurring, and will continue to incur damages in an amount to be proved at trial related to PFOS and PFOA contamination of the groundwater and/or other natural resources at and from the Specific Location.

127.    As a further direct and proximate result of each of the Defendants' respective acts and omissions, the State has incurred, and will continue to incur, investigation, cleanup and removal, restoration, treatment, monitoring, and other costs and expenses related to contamination of the groundwater and/or other natural resources at and from the Specific Location, for which Defendants are strictly liable as a result of Non-AFFF PFAS Products.

128.    Each of the Defendants knew it was substantially certain that its respective acts and omissions described above would cause PFOS and PFOA contamination of the groundwater and/or other natural resources at and from the Specific Location where Defendants' Non-AFFF PFAS

Products were transported, stored, used, handled, released, spilled, and/or disposed and the other harms described herein.

129.    Each of the Non-AFFF PFAS Products was in a defective condition when it left the respective Defendants' possession or control.

130.    The State and its citizens did not voluntarily expose themselves to the risks posed by Non-AFFF PFAS Products.

131.    The State and its citizens did not realize the dangers posed by each of the Defendants' Non-AFFF PFAS Products to the Specific Location.

132.    The State and its citizens did not unreasonably or knowingly expose themselves to the risk posed by each of the Defendants' respective Non-AFFF PFAS Products.

133.    Each of the Defendants committed the above-described acts and omissions with actual malice or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions.

134.    As a result of each of the Defendants' design and formulation of a defective product, each of the Defendants is strictly liable for all such damages arising out of contamination of the groundwater and/or other natural resources at and from the Specific Location, and the State is entitled to recover all such damages and other relief as set forth below.

## COUNT III: STRICT PRODUCTS LIABILITY – FAILURE TO WARN (All Defendants)

135.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Petition as if restated in full therein.

136.    As designers, manufacturers, marketers, and sellers of Non-AFFF PFAS Products containing PFOS, PFOA, and/or their precursors, each of the Defendants had a strict duty to the State and to those who were foreseeably at risk of being harmed by Non-AFFF PFAS Products to warn users

29

of those products and the State of the foreseeable harms associated with them. *See Kirkland v. General Motors Corp.*, 1974 OK 52; *Smith v. U.S. Gypsum*, 1980 OK 33.

137.    Each of the Defendants knew or should have known that exposure to Non-AFFF PFAS Products presented a substantial danger when used because it is hazardous to human health and the environment.

138.    Each of the Defendants knew or should have known that the manner in which it was manufacturing, marketing, and selling its Non-AFFF PFAS Products would result in harm to the State, including contamination of groundwater and/or other natural resources at and from the Specific Location.

139.    Ordinary consumers of the Defendants' Non-AFFF PFAS Products would not have recognized the risks posed by those products, including the risks of contamination of groundwater and/or other natural resources at and from the Specific Location.

140.    Each of the Defendants failed to adequately warn the State of the likelihood that PFOS and/or PFOA would be released into the environment during the normal use of their respective Non-AFFF PFAS Products and of the widespread, toxic, and persistent effects of such releases. Each of the Defendants failed to provide such warnings to (i) users and buyers of its Non-AFFF PFAS Products containing PFOS, PFOA, and/or their precursors; (ii) the State; and (iii) others to which it was reasonably foreseeable Defendants' Non-AFFF PFAS Products would cause harm.

141.    Adequate instructions and warnings on the Non-AFFF PFAS Products could have reduced or avoided these foreseeable risks of harm to Plaintiff and the groundwater and/or other natural resources at and from the Specific Location.

142.    Had the Defendants provided adequate warnings, the users and buyers of the products, the State, and others who would reasonably foreseeably transport, store, use, release, dispose,

and/or otherwise handle or be harmed by the Non-AFFF PFAS Products would have taken measures to avoid or lessen the exposure.

143. The lack of sufficient warnings was a substantial factor in causing the Specific Location where the Defendants' respective Non-AFFF PFAS Products were transported, stored, used, handled, released, spilled, and/or disposed to become contaminated with PFOS and PFOA, and subsequently contaminate and injure the groundwater and/or other natural resources at and from the Specific Location.

144. As a direct and proximate result of each of the Defendants' failure to warn of the hazards of Non-AFFF PFAS Products containing PFOS, PFOA, and/or their precursors, the Specific Location where the Defendants' respective Non-AFFF PFAS Products were transported, stored, used, handled, released, spilled, and/or disposed, and the groundwater and/or other natural resources at and from the Specific Location have become contaminated with PFOS and PFOA.

145. As a direct and proximate result of each of the Defendants' acts and omissions, the State has incurred, is incurring, and will continue to incur damages related to PFAS contamination from Non-AFFF PFAS Products in an amount to be proven at trial.

146. Each of the Defendants' acts and omissions was willful, wanton, reckless, and/or conducted with a reckless indifference to the rights of persons who foreseeably might be harmed by those acts or omissions, including the State.

147. Each of the Defendants is strictly liable for such damages to the State and other relief as set forth below.

## COUNT IV: NEGLIGENCE (All Defendants)

148. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Petition as if restated in full therein.

149.    To establish a prima facie case of negligence, a plaintiff must show:

(1) a duty owed by the defendant to protect the plaintiff from injury,

(2) a failure to properly exercise or perform that duty, and

(3) the plaintiff's injuries are caused by the defendant's breach.

*Jackson v. Jones*, 1995 OK 131, ¶ 5.

150.    As manufacturers, refiners, formulators, distributors, suppliers, sellers, marketers, shippers, or handlers of Non-AFFF PFAS Products, each of the Defendants had a duty to the State to ensure that PFOS and/or PFOA was not released as a result of the transport, storage, use, handling, release, spilling, and/or disposal of its Non-AFFF PFAS Products and did not contaminate the groundwater and/or other natural resources at and from the Specific Location. Each of the Defendants had a duty to the State to exercise due care in the design, manufacture, marketing, sale, testing, labeling, and instructions for use of its respective Non-AFFF PFAS Products containing PFOS, PFOA, and/or their precursors.

151.    Each of the Defendants owed a duty to the State to exercise reasonable care in the instructing, labeling, and warning of the handling, control, use, and disposal of its Non-AFFF PFAS Products.

152.    Each of the Defendants breached these duties by, among other things, failing to conform to the requisite standard of care.

153.    Despite knowing that their respective Non-AFFF PFAS Products are toxic, can contaminate soil and water resources, and present significant risks to human health and the environment, each of the Defendants breached its respective duty of care to the State by failing to use reasonable care when it: (a) designed, manufactured, formulated, handled, labeled, instructed, controlled, marketed, promoted, and/or sold Non-AFFF PFAS Products; (b) issued instructions on

how Non-AFFF PFAS Products should be used and disposed of; (c) failed to recall and/or warn the users of Non-AFFF PFAS Products of the dangers to human health and groundwater and/or other natural resources contamination as a result of standard use and disposal of these products; and (d) failed and refused to issue the appropriate warnings and/or recalls to the users of Non-AFFF PFAS Products regarding the proper use and disposal of these products, notwithstanding the fact that each of the Defendants knew, or could determine with reasonable certainty, the identity of the purchasers of their respective Non-AFFF PFAS Products.

154.    Each of the Defendants' respective negligent acts and/or omissions was a direct and proximate cause of the exposure to unsafe levels of fluorochemicals of the groundwater and/or other natural resources at and from the Specific Location.

155.    Each of the Defendants' respective (1) failure to act with reasonable care to design a product to perform safely; (2) failure to issue an adequate warning or instruction on the use of Non-AFFF PFAS Products warning; and (3) failure to issue a recall, was a substantial factor in causing the contamination of the groundwater and/or other natural resources at and from the Specific Location with PFAS.

156.    Each of the Defendants knew, or reasonably should have known, that users and consumers would not realize the danger of their respective Defendants' Non-AFFF PFAS Products posed to human health and the environment.

157.    A reasonable manufacturer or distributor under the same or similar circumstances would have warned of the danger.

158.    Each of the Defendants was actually or constructively aware of the dangers of Non-AFFF PFAS Products, and of their respective tortious acts or omissions, and, further, knew or should have known that their respective Non-AFFF PFAS Products would, or was likely to, cause

injury to the groundwater and/or other natural resources at and from the Specific Location as a result of breaches of the above-noted duties. Nevertheless, with reckless indifference to these consequences, and as previously detailed, each of the Defendants negligently, recklessly, willfully, and/or wantonly breached its respective duties owed to Plaintiff through the acts of commission and/or omission described herein.

159.    The groundwater and/or other natural resources at and from the Specific Location have become contaminated with PFAS as a direct and proximate result of each of the Defendants' negligent acts and/or omissions in designing Non-AFFF PFAS Products and in failing to warn the purchasers of AFFF, the State, and others whom each of the Defendants should have reasonably foreseen would transport, store, use, handle, release, spill, and/or dispose of Non-AFFF PFAS Products of the harms posed by said products.

160.    The collective and respective acts and omissions of each of the Defendants were negligent, intentional, malicious, willful, and/or wanton and in reckless disregard of persons who foreseeably might be harmed by those acts or omissions, including the State.

161.    As a direct and proximate result of each of the Defendants' acts and omissions, the State has incurred, is incurring, and will continue to incur costs and expenses related to the investigation, clean up and removal, treatment, monitoring, and restoration of PFAS contamination of the groundwater and/or other natural resources at and from the Specific Location from Defendants' Non-AFFF PFAS Products for which each of the Defendants is liable.

## COUNT V: CONCEALMENT & NEGLIGENT MISREPRESENTATION (All Defendants)

162.    Plaintiff incorporates herein by reference each and every paragraph of this Petition as though set forth in full in this cause of action.

163. "Liability for constructive fraud may be based on a negligent misrepresentation." *Sutton v. David Stanley Chevrolet, Inc.*, 2020 OK 87, ¶ 11. Constructive fraud has been defined as "the concealment of material facts which one is bound under the circumstances to disclose." *Id.* (citations omitted).

164. Each of the Defendants, individually and acting through its respective employees and agents, as well as in concert with one another, knowingly, intentionally, maliciously, willfully, wantonly, recklessly, and/or negligently failed and/or refused to advise Plaintiff of the dangers and/or health risks posed by each of the Defendants' Non-AFFF PFAS Products.

165. Each of the Defendants, individually and acting through its respective employees and agents, as well as in concert with one another, negligently, knowingly, maliciously, willfully, wantonly, recklessly, and/or intentionally withheld, misrepresented, and/or concealed information regarding each of the Defendants' Non-AFFF PFAS Products from the State, although the State had a right to know of information that would have prevented the contamination of groundwater and/or other natural resources at and from the Specific Location with PFAS.

166. For at least several decades, each of the Defendants had actual or constructive knowledge that their respective Non-AFFF PFAS Products were causally connected with or could increase the risk of causing damage to humans and animals, including knowledge of statistically significant findings showing a causal connection between exposure to Non-AFFF PFAS Products and physical injuries in humans and animals.

167. In connection with their respective Non-AFFF PFAS Products, each of the Defendants have had and continue to have a duty of care to disclose to the State the actual and potential hazards to the groundwater and/or other natural resources at and from the Specific Location, as well as its persons.

35

168.   As a direct and proximate result of each of the Defendants' acts and/or omissions, the Defendants breached the duty to disclose owed to the State, exposing the State's citizens, wildlife, and other natural resources to harmful levels of PFAS.

169.   Through each of the Defendants' superior knowledge, responsibility, and/or control over the Non-AFFF PFAS Products, and each of the Defendants' voluntary actions and/or representations, a relationship of trust and confidence existed between each of the Defendants and Plaintiff.

170.   Despite each of the Defendants' respective knowledge regarding fluorochemical exposure, and despite each of the Defendants' duties to disclose to Plaintiff, each of the Defendants negligently, maliciously, knowingly, willfully, wantonly, recklessly, and/or intentionally withheld, misrepresented, and/or concealed information from the State regarding harms associated with exposure to their Non-AFFF PFAS Products with the intention to mislead the State into believing that their Non-AFFF PFAS Products were not harmful, and to mislead entities within the State into continuing to use the Non-AFFF PFAS Products.

171.   Each of the Defendants withheld, misrepresented, and/or concealed information regarding fluorochemical exposure, and such acts of omission and/or commission by each Defendant was a substantial factor in causing the harm to the Plaintiff described herein.

172.   As a direct and proximate result of the aforesaid acts and/or omissions by each of the Defendants, acting for and on its own behalf and as an agent, ostensible agent, employee, conspirator, and/or joint venture of others, the groundwater and/or other natural resources at and from the Specific Location were exposed to Non-AFFF PFAS Products of each of the Defendants and were harmed.

36

173.    Each of the Defendants, individually and acting through its employees and agents, and in concert with each other, made misrepresentations and concealed facts material to Plaintiff and its citizens to induce them to purchase and use Non-AFFF PFAS Products as set forth in detail above.

174.    Each of the Defendants knew, at the time that it made its respective misrepresentations, that such statements were false, made recklessly without knowledge of the truth, and/or had no reasonable ground for believing such assertions.

175.    Each of the Defendants intended that Plaintiff and its citizens would rely on its misrepresentations regarding the risks and efficacy of its Non-AFFF PFAS Products.

176.    Each of the Defendants had, and continues to have, a duty of care to provide Plaintiff, with truthful representations regarding the actual and potential harm posed by its Non-AFFF PFAS Products, and each of the Defendants, as a direct and proximate result of each of the Defendants' respective acts and/or omissions, breached that duty owed to the Plaintiff.

177.    Each of the Defendants voluntarily assumed a duty of care to provide Plaintiff with truthful representations regarding its respective Non-AFFF PFAS Products and the actual and potential harm posed by said products, and, as a direct and proximate result of each of the Defendants' respective acts and/or omissions, breached that duty owed to the Plaintiff. Each of the Defendants' affirmative representations and/or omissions to Plaintiff was false and was material to Plaintiff in forming the belief that the Defendants' respective Non-AFFF PFAS Products were safe, in causing Plaintiff to continue to allow entities within the State to use Non-AFFF PFAS Products, and in causing Plaintiff to not previously seek remediation and/or ways to remedy the past and continuing contamination of the groundwater and/or other natural resources at and from the Specific Location by Non-AFFF PFAS Products.

178.    Each of the Defendants made the affirmative representations and/or omissions to Plaintiff with the intention that Plaintiff would be misled into relying on such affirmative representations and/or omissions.

179.    Plaintiff relied on each of the Defendants' affirmative representations and/or omissions in forming the belief that the Defendants' respective Non-AFFF PFAS Products were safe, in causing Plaintiff to continue to allow entities within the State to use Non-AFFF PFAS Products, and in causing Plaintiff to not previously seek remediation and/or ways to remedy the past and continuing contamination of the groundwater and/or other natural resources at and from the Specific Location by Non-AFFF PFAS Products.

180.    Plaintiff was harmed as a direct and proximate result of its justified reliance on each of the Defendants' affirmative, tortious representations and/or omissions and, as a direct and proximate result of such justified reliance, Plaintiff continued to allow entities within the State to use the Non-AFFF PFAS Products.

181.    Defendants' repeated and continuing conduct was willful, wanton, and malicious and was directed at the public generally. As a result, the State seeks to recover punitive damages against Defendants.

### COUNT VI: PUBLIC NUISANCE (All Defendants)

182.    Plaintiff incorporates the allegations set forth above as if they were fully set forth herein.

183.    Under Oklahoma law, nuisance is defined as follows:

A nuisance consists in unlawfully doing an act, or omitting to perform a duty, which act or omission either:

First. Annoys, injures or endangers the comfort, repose, health, or safety of others; or

Second. Offends decency; or

Third. Unlawfully interferes with, obstructs or tends to obstruct, or renders dangerous for passage, any lake or navigable river, stream, canal or basin, or any public park, square, street or highway; or

Fourth. In any way renders other persons insecure in life, or in the use of property, provided this section shall not apply to preexisting agricultural activities. 50 O.S. § 1.

184.    "A public nuisance is one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon the individuals may be unequal." 50 O.S. § 2.

185.    Each of the Defendants, individually and acting through their employees and agents, and in concert with each other, have intentionally, recklessly, or negligently engaged in conduct or omissions which endanger or injure the property, health, safety, and/ or comfort of a considerable number of persons in those areas impacted by their production, promotion, and marketing of Non-AFFF PFAS Products.

186.    Each of the Defendants' tortious conduct, misrepresentations and omissions regarding Non-AFFF PFAS Products, as set forth above, has created an irreversible ecological crisis in those areas impacted that constitutes a public nuisance. Defendants have created a crisis that simultaneously affects entire communities, neighborhoods, and a considerable number of persons.

187.    Each of the Defendants has violated a public right, that is, the right to the public good, such as an indivisible resource shared by the public at large in the groundwater and/or other natural resources at and from the Specific Location.

188.    Defendants did not uphold their responsibility to put a lawful, non-defective product into the market. Rather, Defendants' introduction of Non-AFFF PFAS Products into the market was inconsistent with EPA guidelines.

189.    The Defendants' misrepresentations and omissions regarding Non-AFFF PFAS Products constitute unlawful acts and/or omissions of duties, which annoy, injure, or endanger the comfort, repose, health, and/or safety of others, and offend decency to a considerable number of persons in those areas impacted.

190.    The Defendants have a duty to abate the nuisance they created.

191.    The Defendants have failed to abate the nuisance they created.

192.    Defendants' conduct directly and proximately caused the groundwater and/or other natural resources at and from the Specific Location to become contaminated with PFAS.

193.    As a direct result of the Defendants' conduct, the State has suffered economic damages including, but not limited to, costs and expenses the State has incurred, is incurring, and will continue to incur related to the investigation, clean up and removal, treatment, monitoring, and restoration of PFAS contamination of the groundwater and/or other natural resources at and from at and from the Specific Location from Defendants' Non-AFFF PFAS Products for which Defendants are liable.

## COUNT VII: FRAUDULENT CONVEYANCE; VIOLATION OF OKLAHOMA UNIFORM FRAUDULENT TRANSFER ACT (DuPont Defendants)

194.    Plaintiff incorporates the allegations set forth above as if they were fully set forth herein.

195.     Plaintiff seeks all relief available under the Oklahoma Uniform Fraudulent Transfer Act (the "Act") for the DuPont Defendants' violations of the Act for their fraudulent conveyances as part of their various spin-off transactions.[1]

196.     Pursuant to the Oklahoma Uniform Fraudulent Transfer Act, "[a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation," with "actual intent to hinder, delay, or defraud any creditor of the debtor," or "[w]ithout receiving a reasonably equivalent value in exchange for the transfer or obligation," provided the debtor "was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction, or "intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due." 24 O.S. § 116.

197.     Additionally, under the Act, "A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation." 24 O.S. § 117(a).

198.     The DuPont Defendants engaged in acts in furtherance of a scheme to transfer DuPont's assets so that parties in PFAS litigation, such as Plaintiff, could not obtain funds or collect a judgment that they are or will be owed. As a result of the DuPont Defendants' acts, omissions, and other conduct described herein, Plaintiff has been damaged.

---

[1] As previously defined, the "DuPont Defendants" refers to all DuPont entities named herein, including Defendant Corteva, and all Chemours entities named herein.

199.    At all relevant times, the DuPont Defendants (1) have acted with actual intent to hinder, delay, and defraud parties; (2) have acted without receiving a reasonably equivalent value in exchange for the transfer obligation arising out of the DuPont-Chemours spin-off; and/or (3) were engaged or were about to engage in a business for which the remaining assets of Chemours were unreasonably small in relation to the business or the liabilities that the business intended to incur, or those liabilities the DuPont Defendants believed or reasonably should have believed that Chemours would incur.

200.    For decades, DuPont manufactured, marketed, distributed, and/or sold PFAS for use in Non-AFFF PFAS Products with the superior knowledge that they were toxic, mobile, persistent, bioaccumulative, and biomagnifying, and through normal and foreseen use, would impact Plaintiff's citizens, wildlife, water sources, and other natural resources.

201.    As a result of the transfer of assets and liabilities described herein, the DuPont Defendants have attempted to limit the availability of assets to cover judgments for all of the liability for damages and injuries from their manufacture, marketing, distribution, and/or sale of Non-AFFF PFAS Products.

202.    At the time of the transfer of its performance chemical business to Chemours, DuPont had been sued, had notice of suits, and/or had knowledge of likely litigation regarding DuPont's liability from the manufacture, marketing, distribution, and/or sale of Non-AFFF PFAS Products.

203.    The DuPont Defendants acted without receiving consideration and/or a reasonably equivalent value in exchange for the transfer or obligation, and DuPont believed or reasonably should have believed that Chemours would incur debts beyond Chemours' ability to pay when those debts became due.

204.    The claims, judgment, and potential judgments against Chemours potentially exceed its ability to pay. Accordingly, Plaintiff seeks avoidance of the transfer of DuPont's liabilities for the claims brought herein and seeks to hold the DuPont Defendants liable for any damages or other remedies that may be awarded by the Court or jury arising from this Petition. Plaintiff further seeks all other rights and remedies that may be available to it under the Oklahoma Uniform Fraudulent Transfer Act, including prejudgment remedies as available under applicable law, as may be necessary for full compensation of damages and injuries Plaintiff has suffered as alleged herein.

## CLAIM FOR PUNITIVE DAMAGES

1. Plaintiff hereby repeats, realleges, and reiterates each and every allegation in the preceding paragraphs as if fully restated herein.

2. Plaintiff seeks punitive damages pursuant to 23 O.S. § 9.1 for the acts of the Defendants as set forth and alleged throughout this Petition.

3. Each of the Defendants' negligent, reckless, willful, and/or wanton actions and/or intentional failures to act caused Plaintiff's citizens, wildlife, and other natural resources to be exposed to and contaminated with Non-AFFF PFAS Products.

4. The willful, wanton, malicious, and/or reckless conduct of each of the Defendants, includes, but is not limited to:

    a.    issuing no warnings and failing to divulge material information concerning the release of PFAS, including, but not limited to PFOA and PFOS;

    b.    failing to take all reasonable measures to ensure Non-AFFF PFAS Products would be used effectively and properly disposed of; and

    c.    failing to prevent the foreseeable impacts of PFAS contamination upon the Plaintiff.

43

5.      Each of the Defendants acted with malice, purposely, and intentionally. At a minimum, each of the Defendants engaged in the conduct alleged herein with a conscious disregard for the rights and safety of other persons, even though that conduct had a great probability of causing substantial harm.

6.      Plaintiff is entitled to punitive damages in addition to actual damages from Defendants.

## PRAYER FOR RELIEF

**WHEREFORE,** the Plaintiff, STATE OF OKLAHOMA seeks judgment against these Defendants as follows:

a.      In an amount in excess of $75,000.00;

b.      Equitable relief, including but not limited to abatement of the nuisances complained of herein, permanently enjoining Defendants from further violations of the OCPA, as per 15 O.S. §756.1;

c.      Punitive damages;

d.      Costs (including reasonable attorneys' fees, court costs, costs of investigation and prosecution of this action, as per the OCPA, 15 O.S. § 761.1, and other expenses of litigation);

e.      An order requiring Defendants to pay a civil penalty in the amount of $10,000.00 for each violation of the OCPA, 15 O.S. §756.1;

f.      An order voiding the Chemours Transfers and recovering property and value transferred to Old DuPont;

g.      An order voiding the Old DuPont Transfers and recovering property and value transferred to New DuPont;

44

h.      An order voiding the Old DuPont Transfers and recovering property and value transferred to Corteva;

i.      An order enjoining New DuPont, as transferee, from distributing, transferring, capitalizing, or otherwise disposing of any proceeds from the sale of any business lines, segments, divisions, or other assets that formerly belonged to Old DuPont;

j.      An order enjoining Corteva, as transferee, from distributing, transferring, capitalizing, or otherwise disposing of any proceeds from the sale of any business lines, segments, divisions, or other assets that formerly belonged to Old DuPont;

k.      An order imposing constructive trust over the proceeds of the Chemours Transfers to Old DuPont for the benefit of the State;

l.      An order imposing constructive trust over the proceeds of the Old DuPont Transfers to New DuPont for the benefit of the State;

m.      An order imposing constructive trust over the proceeds of the Old DuPont Transfers to Corteva for the benefit of the State; and

n.      For such and other relief as the Court may deem proper.

## REQUEST FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all causes of action for which a jury is available under the law.

*[signature block on next page]*

**GENTNER DRUMMOND**
**ATTORNEY GENERAL OF OKLAHOMA**

GENTNER DRUMMOND, OBA #16645
*Attorney General*
JENNIFER L. LEWIS, OBA #32819
*Deputy Attorney General*
CAMERON CAPPS, OBA # 32742
*Deputy Attorney General*
Oklahoma Office of the Attorney General
313 N.E. 21st Street
Oklahoma City, OK 73105
Telephone: (405) 521-3921
jennifer.lewis@oag.ok.gov

S. ALEX YAFFE, OBA #21063
ERIC J. CAVETT, OBA #22098
FOSHEE & YAFFE
12231 South May Avenue
P.O. Box 890420
Oklahoma City, OK 73189
Telephone: (405) 378-3033
Facsimile: (405) 632-3036
ay@fylaw.com
ejc@fylaw.com

JOSEPH F. RICE, D.S.C. No. 3445
FRED THOMPSON, III, D.S.C. No. 4081
T. DAVID HOYLE, D.S.C. No. 9928
REBECCA FONSECA, D.S.C. No. 13297
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
jrice@motleyrice.com
fthompson@motleyrice.com
dhoyle@motleyrice.com
rfonseca@motleyrice.com

And

LINDA SINGER, DC BAR NO. 502462
MOTLEY RICE LLC
401 9th Street NW, Suite 630
Washington, DC 20004
Telephone: (202) 232-5504
Facsimile: (202) 232-5513
lsinger@motleyrice.com

46

## CERTIFICATE OF MAILING

I certify that on this 5th day of September 2025, I mailed a copy of the forgoing Amended Petition, via regular U.S. mail and electronic mail, to the following:

Phillip G. Whaley
Stephen L. Jantzen
Paula M. Jantzen
RYAN WHALEY
400 North Walnut Avenue
Oklahoma City, OK 73104
pwhaley@ryanwhaley.com
sjantzen@ryanwhaley.com
pjantzen@ryanwhaley.com
*Attorneys for Defendants 3M Company*

Brent Dwerlkotte
Shook, Hardy & Bacon L.L.P.
2555 Grand Boulevard
Kansas City, MO 64108
dbdwerlkotte@shb.com
*Attorneys for Defendants DuPont/Chemours*

ERIC J. CAVETT

47